IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

JUNE 1998 SESSION

FILED

April 21, 1999

Cecil W. Crowson
Appellate Court Clerk

RICHARD STANLEY RUSSELL, )
)
    Appellant, )    No. 01C01-9707-CR-00302
)
)     Davidson County
v. )
)     Honorable Seth Norman, Judge
)
STATE OF TENNESSEE, )    (Post-Conviction)
)
    Appellee. )

For the Appellant:

Thomas F. Bloom
500 Church Street
Nashville, TN 37219

For the Appellee:

John Knox Walkup
Attorney General of Tennessee
    and
Karen M. Yacuzzo
Assistant Attorney General of Tennessee
425 Fifth Avenue North
Nashville, TN 37243-0493

Victor S. Johnson, III
District Attorney General
    and
Kymberly Haas
Assistant District Attorney General
Washington Square, Suite 500
222 Second Avenue, North
Nashville, TN 37201

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

**O P I N I O N**

The petitioner, Richard Stanley Russell, appeals as of right from the Davidson County Criminal Court's denial of post-conviction relief. The petitioner was convicted of first degree murder and sentenced to life in the Tennessee Department of Correction. His conviction was affirmed on direct appeal to this court. State v. Richard Stanley Russell, Sr., No. 01C01-9409-CR-00308, Davidson County (Tenn. Crim. App. Oct. 31, 1995), app. denied, (Tenn. Mar. 25, 1996). The petitioner contends that the trial court erred in concluding that he received the effective assistance of counsel at his trial. We disagree.

Although the record does not contain the details of the petitioner's charges or trial, this court's opinion in the direct appeal outlines the essential events. On February 25, 1993, the police responded to a 9-1-1 call and found the petitioner's wife stabbed to death. The petitioner was at the scene and had blood covering his hands and clothes.

Testimony at the trial indicated that the petitioner and his wife had an argument about her sexual preferences. The petitioner testified that after arguing, he went into the kitchen and started writing a note describing the details of the argument. The petitioner testified that after the argument resumed, he picked up a knife his wife kept with her, pointed it at his stomach and told her that he might as well kill himself and save her the trouble. He stated that he did not remember what happened after that, but eventually he found himself in the kitchen with the note and a bloody knife. He said that he then called his daughter and asked her to call 9-1-1. He said that before he opened the door for the police, he hugged his wife's bloody body.

2

With this evidence, the petitioner was convicted of first degree murder. On appeal, the petitioner claimed that the evidence was not sufficient and that the trial court erred in allowing a reference to a higher power during voir dire and in excluding evidence of the victim's character. This court determined that the evidence supporting the jury's finding that the appellant was guilty of first degree murder beyond a reasonable doubt was overwhelming and that the petitioner's claims were without merit.

The petitioner filed a pro se petition for post-conviction relief. Appointed counsel filed an amended petition, alleging that the petitioner received the ineffective assistance of trial counsel because his trial attorneys (1) failed to consult adequately with the petitioner before trial regarding the case theory, the petitioner's charges, the state's plea offer, and the strength of the state's case, (2) failed to object to the introduction of the victim's bloody T-shirt, which was highly prejudicial and misleading, (3) failed to conduct an adequate investigation and to interview the petitioner properly, (4) failed to employ experts such as a forensic pathologist, a mental health expert, or a handwriting expert, and (5) failed to use the 9-1-1 tape to discredit a police officer's testimony.

At the post-conviction hearing, the petitioner's daughter testified that she met with the petitioner's trial attorneys before trial. She testified that she knew that the state had made a plea offer, and one of the attorneys discussed it with her just before the trial. She stated that she was not aware that the petitioner was indicted for first degree murder until the day of the trial, but she admitted on cross-examination that during a meeting before trial, the attorneys discussed first degree murder as a potential outcome of the trial. She testified that a psychiatric examination of her father was never made, but she believed that he needed one for the trial.

3

The petitioner testified that he was appointed an attorney, Barbara Futter, who met with him almost daily until he posted bond. He said that he met his second attorney, David Siegel, about nine months later. The petitioner said that after that meeting, he rarely met with his attorneys other than for court hearings. He testified that the weekend before the trial he met with both attorneys for trial preparation.

The petitioner testified that he told Ms. Futter about the events leading up to his arrest for the murder of his wife. He said that he told his attorney that he argued with his wife about her plan for him to help her kidnap her daughter. He said that he told his wife that he did not want to hear any of it. He testified that he went to the kitchen and started writing a note. He said that the victim called him into the living room, and they started arguing again. He testified that there was a knife on the footstool and that he picked it up and told the victim that she would not have to kill him, that he would do it himself. He said that he remembered her coming toward him, but he did not remember anything after that until he found himself in the kitchen continuing his note. The petitioner testified that as he was writing the note, he saw the bloody knife. He said that he then called his daughter and told her to call 9-1-1. He said that he held his wife before he opened the door for the police.

The petitioner testified that he was trained in security and that the state's contention that he stabbed the victim three times in the chest and three times in the back could not be true. He said that he did not agree with an autopsy report that the victim was stabbed six times. The petitioner said that he believed that an autopsy was not performed.

The petitioner testified that he thought his attorneys should have more thoroughly investigated the victim's plan to kidnap her daughter. The petitioner did not know of any accomplices to the kidnapping scheme, but he said that three others were

4

supposed to be involved. The petitioner testified that he was not aware of his attorneys contacting anyone involved in the alleged scheme. He said that he was unaware of his attorneys contacting any of the victim's friends or anyone the victim knew while in prison.

The petitioner testified that his attorneys did not show him any photographs of the crime scene before the trial started. He said that if they had, he would have been able to analyze them and testify during trial that the photographs were not accurate. He stated that one photograph showed a blanket wrapped around the victim's legs as if the victim were helpless at the time of the offense. He testified that the blanket was not in the house at the time of the offense and that it had to have been brought in by either the police or the medical examiner. He further stated that the photograph showed that the blanket had not been on the victim long because the blanket had only spots of blood on it and was not soaked with blood.

The petitioner testified that the note introduced as evidence at trial was not the original note that he was writing before and after the offense. He said that the copy of the note that was entered into evidence was written on notebook paper, but the note he wrote was written on a legal pad. He also said that the original note had a bloodstain on it. The petitioner testified that although he had a cut on his hand, his hands were not bloody when he returned to continue writing the note after he blacked out. He said that it was not until he hugged the victim that he got blood on his hands and clothes.

The petitioner testified that he did not have any psychological or psychiatric evaluations. He said that at the time he was released from jail, his attorney suggested that he see a doctor, but he thought that she was recommending this because he was having a lot of trouble accepting what had happened. Additionally, the

petitioner stated he thought that a handwriting expert should have examined the note. He said an expert would have identified two different writing styles indicating that the note was written at two different times while he was in two very different emotional states.

The petitioner testified that he thought an expert should have examined the murder weapon, a kitchen knife. He said that even though he blacked out during the offense, he knew that if he did strike the victim, he would have struck out with his full force because he was afraid of her. He testified that the full length of the blade would have penetrated the victim and caused an entry wound in her chest and an exit wound in her back. He said that he did not stab the victim in the back and that an expert examination of the knife would have shown blood and tissue up to the knife's hilt. He testified that the photographs show that the knife went all the way through the victim because the photographs show the blood pooling underneath the victim as she lay on her back and little blood on her chest.

The petitioner testified that the 9-1-1 tape made when his daughter called the police should have been used to discredit the testimony of the responding police officer. He said that the tape would have established the time of the call and that this would have shown that the victim was dead when the police responded to the call. He said that the officer testified that he saw blood bubbles coming out of the victim's nose and mouth when he arrived, indicating that the victim was still alive and breathing. The petitioner said that testimony at the trial showed that the victim would have died within two to four minutes after being stabbed. He testified that the tapes would prove that sufficient time had elapsed for the victim to die before the testifying officer made his observation.

The petitioner testified that his attorneys discussed the penalties for first degree murder, second degree murder, and manslaughter with him, but they did not discuss the elements of these offenses. He said that he was given a copy of his indictment after he was indicted.

The petitioner testified that he received an offer to plead guilty to second degree murder with a fifteen-year sentence at thirty percent. He said that this plea offer was made just after he was released on bond. He testified that after he rejected this offer, his attorneys said nothing more about a plea bargain. He said that just before trial, he asked his attorneys to ask if the state would accept a plea of manslaughter with a six-year sentence, but they did not. The petitioner testified that he would have considered the plea offer more seriously if he had known that the state was going to claim that the victim was stabbed three times in the chest and three times in the back and that the photographs and the victim's bloody T-shirt were going to be used as evidence.

David Siegel testified that he was assigned to assist in the defense of the petitioner because he was charged with handling the more complex, difficult, or serious cases in the public defender's office. He testified that he met and had telephone conversations with the petitioner several times before trial.

Mr. Siegel testified that one theory of the case was that the petitioner acted in self-defense. He said that the victim's history of violence was investigated, including her institutional record from the Department of Correction. He said that he was unsuccessful in getting everything that he wanted introduced into evidence during trial. He testified that the other theory of the case was that the crime was one of passion because the petitioner was overcome by the victim's admission of marital infidelity.

7

Mr. Siegel testified that he discussed the theory of the case with the petitioner on several occasions. He said that the petitioner's explanation of the events surrounding his wife's murder remained consistent during the course of representation and trial. He testified that he discussed with the petitioner the possibility of a mental evaluation but that the petitioner was not receptive to the idea at the time. He testified that he did not press the issue because he did not see any signs that the petitioner was mentally disturbed, other than the petitioner's extreme attraction to the victim. He said that it was not unusual for a defendant to say that he does not remember what happened.

Mr. Siegel testified that he and the petitioner discussed the note that the petitioner wrote. He said that he thought certain statements in the note could be used to show either premeditation or a motive to kill the victim. He said that the petitioner never questioned the authenticity of the note during consultation or during the trial.

Mr. Siegel testified that he thought the timing of when the petitioner wrote the note was significant. He said that he questioned the petitioner at length about the note. He said that the petitioner told him that the note was written before the offense. On cross-examination, he testified that the petitioner maintained that the note was written before the stabbing despite vigorous questioning. He testified that the physical evidence suggested that the note was written before the offense because it had an insignificant amount of blood on it.

Mr. Siegel testified that he showed many photographs to the petitioner. He said that when he showed the more graphic photographs of the victim to the petitioner, the petitioner became extremely upset and emotional. He said that in order to continue working with the petitioner, he and Ms. Futter decided not to show the petitioner the graphic photographs, but they described their contents to him.

8

Mr. Siegel testified that he spoke with the petitioner about the state's plea offer. He said that he remembered explaining the possible outcomes of the trial to the petitioner. He testified that he explained what the state would have to prove and the consequences of each possible outcome to the petitioner. He stated that he and Ms. Futter strongly encouraged the petitioner to accept the plea but that the petitioner would not agree to any charge of murder. He said that he felt that the state was offering the lowest level of punishment for what he and Ms. Futter thought would be the most likely result of the trial.

Mr. Siegel testified that he examined the physical evidence before trial. He said that he was unaware of an objection that could have prevented the introduction of the victim's bloody T-shirt. He testified that the evidence supported the state's contention that the victim was stabbed six times. He said that the petitioner's claim that the petitioner stabbed the victim only three times, with the knife entering her chest and extending through her back, would not have been a productive issue to raise during trial.

Mr. Siegel testified that he and Ms. Futter obtained the 9-1-1 tape, even though the trial court denied their motion requesting the state to produce it. He said that the tape's only value was to show that the petitioner's daughter, who made the 9-1-1 call, thought that the petitioner might have been suicidal. He testified that he did not need the tape because other evidence showed that the petitioner was on a suicide watch at the time of the murder.

Mr. Siegel testified that he did not remember interviewing any of the police officers about the murder. He said that he did speak to the victim's mother to corroborate the petitioner's claim of a kidnapping scheme and that he remembered contacting the prison chaplain.

9

Barbara Futter testified that she represented the petitioner and that she met with him the day after the murder and continued to meet with him almost daily while he was in jail. She said that she saw him numerous times between the time he was released and the trial.

Ms. Futter testified that she and David Siegel investigated the kidnapping scheme but could not find any credible information to support it. Ms. Futter testified that she discussed the theory of the case with the petitioner. She said that the theory of the case was a mixture of self-defense and passion and that neither one, by itself, was very strong.

Ms. Futter testified that she discussed the state's plea offer with the petitioner before Mr. Siegel became involved with the case. She did not remember the specific details of that conversation with the petitioner, but she said that it was her habit to discuss the offense charged, the lesser offenses, and what the sentence would be, including parole, good and honor time, and other sentence reductions. She testified that the petitioner stated that he did not murder his wife and that he would not plead to murder. She testified that before the trial, she attempted to get the prosecutor to consider a lesser plea but had no success.

The trial court found that the petitioner failed to prove any grounds for relief. It noted that all of the petitioner's issues related to the ineffective assistance of counsel claim, but it found that none of the attorneys' conduct prejudiced the petitioner.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL

The petitioner contends that he received the ineffective assistance of trial counsel because of trial counsel's (1) failure to investigate adequately the petitioner's mental health to establish the absence of the requisite mens rea for first degree murder,

(2) failure to investigate adequately the facts of the case, (3) failure to obtain necessary experts, (4) failure to obtain information withheld by the state, (5) failure to call two witnesses, (6) failure to communicate properly with the petitioner regarding the plea negotiations, (7) failure to provide the petitioner with sufficient information to make an informed decision on the plea offer, (8) failure to confer with the petitioner about the evidence, (9) failure to conduct a reasonable investigation, (10) failure to object to the admission of the victim's bloody T-shirt, and (11) failure to suppress the petitioner's confession and admissions. Claims (4), (5), (7), (9), (10), and (11) were made by the petitioner in a pro se supplemental brief included as an appendix to the petitioner's brief. The petitioner asserts that the individual and the cumulative effect of trial counsel's failures caused him to receive the ineffective assistance of counsel.

The state initially notes that the petitioner failed to cite to the record in the argument portion of his brief. The argument portion of an appellant's brief must set forth the contentions with respect to the issues presented on appeal with appropriate references to the record. T.R.A.P. 27(a)(7). Pursuant to Rule 10(b), Tenn. Ct. Crim. App. R., the petitioner's failure to cite to the record in support of his argument constitutes a waiver of the issue. However, despite this inadequacy, we will consider the merits of the petitioner's issues.

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is upon the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72, 113 S. Ct. 838, 842-44 (1993). The Strickland standard has been applied, as well, to the right to

11

counsel under Article I, Section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974) and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982) (counsel's conduct will not be measured by "20-20 hindsight"). Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. See Hellard, 629 S.W.2d at 9; DeCoster, 487 F.2d at 1201. We note, as well, that the claim of ineffective assistance of counsel can be defeated by the failure to make the required showing of either deficient performance or sufficient prejudice. Strickland, 466 U.S. at 697, 104 S. Ct. at 2069.

The burden is on the petitioner to prove his allegations by clear and convincing evidence. T.C.A. § 40-30-210(f). On appeal, we are bound by the trial court's findings unless we conclude that the evidence preponderates against those findings. Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). The petitioner has the burden of illustrating how the evidence preponderates against the judgment entered. Id.

**A.**

We will consider the petitioner's first five claims together because they are all resolved by the same analysis. In his first claim, the petitioner contends that he received the ineffective assistance of counsel because his attorneys failed to investigate adequately the petitioner's mental health to establish the absence of the requisite mens rea for first degree murder. The petitioner argues that his attorneys gave no credible explanation as to why a mental health expert was not retained to examine the petitioner's obsession with the victim. The state responds that the petitioner's attorneys testified that the petitioner had no history of mental illness, that he was resistant to undergoing an examination, and that they had no reason to believe a mental evaluation was necessary. The state further contends that the petitioner has not presented any evidence regarding what a mental evaluation would have revealed. The state argues that without such evidence, the petitioner cannot show that he was prejudiced by the lack of an evaluation.

In his second claim, the petitioner contends that he received the ineffective assistance of counsel when his attorneys failed to investigate adequately the facts of the case. The petitioner argues that his attorneys only made a cursory investigation of the victim's kidnapping scheme. The state responds that the petitioner's attorneys met with the petitioner on numerous occasions and interviewed several others, including the investigating officer, the medical examiner, the prison chaplain, and the victim's mother, grandmother and parole officer. The state further contends that one of the petitioner's attorneys did investigate the claim of a kidnapping scheme but could not find any evidence to support it. The state argues that the petitioner has not demonstrated how this investigation could have been more thorough or what more his attorneys could have done.

In his third claim, the petitioner contends that he received the ineffective assistance of counsel because his attorneys failed to obtain necessary experts. The petitioner argues that his attorneys should have had a forensic examination of the bloodstain on the note. He also argues that a handwriting expert's examination of the note would have supported his claim that the murder was not premeditated. The petitioner contends that portions of the note were written after the stabbing. The state responds that before the trial, the petitioner maintained that the entire note was written before the stabbing and that his attorneys therefore had no reason to have the note examined. The state argues that because the petitioner did not have the note examined or present any expert testimony at the post-conviction hearing, the petitioner has not shown how he was prejudiced.

In his fourth claim, the petitioner contends that he received the ineffective assistance of counsel because his attorneys failed to obtain information withheld by the state. The petitioner argues that the 9-1-1 tape was withheld from his attorneys, and the state used information on the tape to encourage perjury by the state's witnesses. He argues that his attorneys could have used the tape to show his state of mind after the stabbing and to show that he was writing the note when he called his daughter. The state responds that testimony during the post-conviction hearing revealed that the trial court denied the motion to provide the 9-1-1 tape but that the petitioner's attorneys did obtain the tape. The state argues that the claim of perjured testimony based on the 9-1-1 tape was not raised at the post-conviction hearing and is waived.

In his fifth claim, the petitioner contends that he received the ineffective assistance of counsel because his attorneys failed to call the victim's parole officer and the petitioner's ex-wife to testify. The petitioner asserts that he requested that the victim's parole officer testify because she could testify to the victim's character. He asserts that he requested that his ex-wife testify because she would testify as to his

14

good character. The state responds that this claim is waived because it was not raised at the post-conviction hearing. The state also argues that the petitioner did not call these two witnesses at the post-conviction hearing and without evidence of their testimony, the petitioner cannot show prejudice.

We note that the approach to the issue of the ineffective assistance of counsel does not have to start with an analysis of an attorney's conduct. If prejudice is not shown, we need not seek to determine the validity of the allegations about deficient performance. Strickland, 466 U.S. at 697, 104 S. Ct. at 2069.

The potential experts and witnesses were not called to testify, and the 9-1-1 tape was not offered as evidence at the post-conviction evidentiary hearing. It is imperative that the witnesses testify and the petitioner offer evidence at the evidentiary hearing in order for the trial court to determine the potential merit of the evidence. See Black, 794 S.W.2d at 755. Thus, even if the attorneys' failure to seek a mental evaluation, investigate the kidnapping scheme further, call forensic and handwriting experts, present the 9-1-1 tape and call certain character witnesses was deficient performance, the petitioner has failed to show that he was prejudiced from such deficiency.

## B.

In his sixth claim, the petitioner contends that he received the ineffective assistance of counsel when his attorneys failed to communicate properly with him regarding the plea negotiations. The petitioner argues that if his attorneys had shared the state's evidence with him, he would have accepted the second degree murder plea offer. The state responds that the petitioner's attorneys had extensive settlement discussions with the state and strongly encouraged the petitioner to accept the offer.

15

In his seventh claim, the petitioner contends that he received the ineffective assistance of counsel when his attorneys failed to provide him with sufficient information to make an informed decision on the plea offer. He contends that his attorneys withheld evidence from him, failed to discuss potential defense strategies, failed to conduct an appropriate investigation, and failed to advise him of the state's plea offer. The petitioner asserts that with sufficient information, he could have rebutted testimony that the victim was alive when police officers arrived, that there was no struggle, that the wounds on the victim's hands were defensive wounds, and the state's depiction of the crime scene.

In his eighth claim, the petitioner contends that he received the ineffective assistance of counsel when his attorneys failed to confer with him about the evidence. The petitioner argues that his attorneys consulted minimally with him and that they withheld certain information from him because of their concern for his fragile mental condition. The state responds that the petitioner's attorneys met with him frequently and that his attorneys testified that they discussed every aspect of the case with the petitioner. The state admits that some photographs were not shown to the petitioner, but it notes that this occurred only when he became so emotional that he was unable to aid in his defense because of them. The state argues that the petitioner has presented no evidence other than his own testimony to show that he was prejudiced.

The petitioner, his daughter, and his trial attorneys were the only witnesses to testify at the evidentiary hearing. The petitioner's daughter testified that the trial attorneys discussed the case and the state's plea offer with her. Ms. Futter testified that she met with the petitioner frequently, discussed the plea offer with the petitioner when she first received it and again when Mr. Seigel became associated with the case, and investigated the petitioner's claims but could not find any credible information to support them. Mr. Seigel testified that he discussed the plea offer with

16

the petitioner when he started the case and again just before trial. He testified that the weekend before the trial, both attorneys met extensively with the petitioner to prepare him for trial.

In Lofton v. State, 898 S.W.2d 246 (Tenn. Crim. App. 1994), the petitioner complained that his trial counsel was ineffective because counsel failed to explain the elements of the crime to him and deprived him of his right to accept a guilty plea offer. Id. at 248. However, the record showed that trial counsel discussed the case with both the petitioner and his mother and discussed the state's plea offer with the petitioner. Id. This court held that even though trial counsel did not take a position as to whether the petitioner should have accepted the plea offer, trial counsel's conduct did not rise to the level of ineffective assistance as set forth in Strickland and in Baxter. Id. at 249.

As in Lofton, the petitioner in this case refused to accept the plea offer and "gambled and lost at trial." Id. His bald assertion that he would have accepted the plea offer if he had full and complete information is insufficient to mandate post-conviction relief. The petitioner has not shown by a preponderance of the evidence that counsel's performance was deficient and that the deficiency was prejudicial.

## C.

In his ninth claim, the petitioner contends that he received the ineffective assistance of counsel because his attorneys failed to conduct a reasonable investigation. The petitioner argues in his supplemental brief that if his attorneys had properly investigated the case, they would have been able to impeach the police officer's testimony about the petitioner's note. The state responds that the petitioner's attorneys thoroughly investigated the case and that nothing in the record indicates that the officer perjured himself.

In the petitioner's supplemental brief, he complains that Exhibit 8, which was used by the state at trial, was not authentic. Exhibit 8 is a two-page reproduction of the note that the petitioner wrote on the night of the stabbing. At the evidentiary hearing, the petitioner was shown Exhibit 8 and a photograph of the note taken at the scene after the stabbing. He testified that Exhibit 8 was written on notebook paper, and the note in the photograph was written on a legal pad. The petitioner testified that he used only legal pads. He testified that the photograph of the note showed a blood spot on the upper left corner. He testified that Exhibit 8 only had what appeared to be an outline of a stain.

The petitioner asserts that if his trial attorneys had sufficiently investigated his case, they would have been able to impeach the officer when he authenticated the note during the trial. The petitioner contends that Exhibit 8 is not a copy of the note that he wrote. However, Mr. Seigel testified that the petitioner never questioned the authenticity of the note before or during the trial.

We note that neither Exhibit 8 nor the photograph were a part of the record provided to this court. According to the petitioner's post-conviction attorney, the photograph was never entered into evidence at the evidentiary hearing. As to this claim, the petitioner has not offered evidence that preponderates against the trial court's conclusion that the petitioner's trial counsel effectively represented the petitioner.

**D.**

In his tenth claim, the petitioner contends that he received the ineffective assistance of counsel because his attorneys failed to object to the admission of the victim's bloody T-shirt. The petitioner argues that the introduction of the T-shirt was unfairly prejudicial and that his attorneys should have objected to its admission. See

Tenn. R. Evid. 403. The state responds that the shirt was probative because it showed the location of the knife holes and helped the jury to determine where the victim was stabbed. The state argues that the fact that the petitioner found the T-shirt personally upsetting does not render the evidence inadmissible.

During the evidentiary hearing, the petitioner testified that all the blood on the T-shirt was not there when the police arrived the night of the stabbing. He also testified that he would have pled guilty in order to prevent the prosecutor from using the bloody T-shirt during the trial. Mr. Seigel testified that he did not know of any objection that he could have made when the T-shirt was introduced.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is admissible unless provided otherwise by constitution, evidentiary rule, or other Tennessee rule or law. Tenn. R. Evid. 402. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

As the state claims, the T-shirt is probative because it shows the number and placement of the holes made by the knife. Furthermore, the probative value is not outweighed by the danger of unfair prejudice. See State v. Cribbs, 967 S.W.2d 773, 793-94 (Tenn. 1998) (holding that admission of a videotape showing "victim's brain matter separated from her skull and scattered across the kitchen floor" and "the shattered face and skull of the victim," was proper under Rule 403); State v. Cazes, 875 S.W.2d 253, 263 (Tenn. 1994) (holding that the victim's cleaned and reconstructed skull

was admissible pursuant to Rule 403). The record does not preponderate against the trial court's conclusion that the petitioner's trial counsel effectively represented the petitioner relative to this claim.

## E.

In his eleventh claim, the petitioner contends that he received the ineffective assistance of counsel because his attorneys failed to suppress his confession and admissions. The petitioner argues that his "confession" was inadmissible and that trial counsel did not prevent its admission or try to defend against it. The petitioner asserts that he confessed when he responded to the officer's question, "Did you kill your wife?" by saying, "I was the only one in the house." The petitioner further asserts that a police officer's testimony of statements made by the petitioner at the scene were fabricated and that his attorneys did not properly impeach this testimony.

The state responds that these issues were not raised at the post-conviction hearing and have been waived. We agree. In any event, we note that his statements were admissible as admissions by a party opponent. Tenn. R. Evid. 803(1.2)(A).

## II. CUMULATIVE ERROR

The petitioner asserts that the cumulative effect of all constitutional errors at trial and on appeal warrant him relief. Because we have concluded that no individual constitutional error exists, there is no improper cumulative impact upon the petitioner. This issue is without merit.

20

In consideration of the foregoing and the record as a whole, we conclude that the evidence does not preponderate against the trial court's denial of post-conviction relief.  The judgment of the trial court is affirmed.


_____
Joseph M. Tipton, Judge


CONCUR:


_____
John H. Peay, Judge


_____
David G. Hayes, Judge

21